UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**DENISE GABLER and PETER A. PFAU,**
       **Plaintiffs,**

    v.                                                       Case No. 14-CV-266

**CITY OF MILWAUKEE,**
       **Defendant.**

---

## DECISION AND ORDER

Denise Gabler and Peter Pfau bring this action alleging that their employer, the City of Milwaukee, retaliated against them in violation of Title VII of the Civil Rights Act of 1964 for opposing unlawful and discriminatory employment practices.[1] Defendant moves for summary judgment. I must grant summary judgment on each claim on which summary judgment is sought "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addressing a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### I. BACKGROUND

Plaintiffs have worked for the Milwaukee Police Department (MPD) since the 1990s. By 2007, they had both been transferred to the MPD's Police Academy, where they worked as instructors in the Firearms Section.

---

[1] Plaintiffs also brought "class-of-one" claims under the Fourteenth Amendment's equal protection clause but abandoned those claims in light of *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), in which the Supreme Court held that "a 'class-of-one' theory of equal protection has no place in the public employment context."

For years, plaintiffs worked with another instructor named Ted Puente. Pfau describes Puente as a "bully" who "always called [him] gay" and "would go on his computer, . . . photo-crop [Pfau's] face on guys running in drag or guys doing sexual acts," and post "that around the office where everyone could see." Pfau Dep., Pfau Decl. Ex. 1, ECF No. 80-1, at 64:11, 70:6, 109:10–:15. Gabler says that, "[d]aily, . . . if not several times a day," Puente addressed her using terms like "cunt," "clam," "dumb bitch," and "whore" and that he made "comments about [her] fertility issues" and "adopting children," such as "don't get any nigger babies, they all do crack and you'll end up with a crack baby." Gabler Dep., Gabler Decl. Ex. 2, ECF No. 78-1, at 59:14–:15, 62:5, 140:12–:24. Sergeant Joseph Seitz, supervisor of the firearms instructors in 2012, says that Puente "called [him] a Jew" in order "to stimulate [him] to spend more money." *See* Seitz Dep., Gabler Decl. Ex. 6, ECF No. 78-7, at 10:15, 11:1–12.

Plaintiffs and others at the Academy also describe threatening or unsafe behavior by Puente. Pfau says, "[Puente] would be in cleaning one of his guns, . . . and he would point it at me, . . . and go, 'Do you wonder if it's loaded?'" Pfau Dep., *supra*, at 326:8–:13. Seitz says that Puente "muzzle swept [him] once," though he doesn't "know if it was intentional or not." Seitz Dep., *supra*, at 16:19–17:4. Gabler heard "rumors that [Puente] had . . . threaten[ed] to kill people in [the] unit." Gabler Dep., *supra*, at 24:4–:5.

On May 11, 2012, Puente got into an argument with another instructor in the Firearms Section office, where plaintiffs, Seitz, and others were working. Pfau and Seitz tried to "lighten the mood" by playing video clips on their computers. *See* Seitz Dep., *supra*, at 20:14–21:14. Then, Puente said, "[T]hat's it, motherfucker, you're the first one I'm going to kill," Gabler Dep., *supra*, at 29:15–:17, or "something to [that] effect," *see*

2

Seitz Dep., *supra*, at 21:15–:17 ("[Y]ou're the first one I'm going to take out . . . ."); Pfau Dep., *supra*, at 34:21–:22 ("You're the first one I'm going to fucking kill."), which they took as a threat directed toward Pfau, *see id.* at 36:3–:5; Gabler Dep., *supra*, at 39:15–:19; Seitz Dep., *supra*, at 21:19–:20. The MPD suspended Puente the next day and transferred him from the Academy to a position in MPD District 7 a few weeks later.

Throughout 2012 and into 2013, plaintiffs had to attend review sessions on departmental policy and were interviewed by the MPD's Internal Affairs Division (IAD), which investigated the May 11, 2012, incident, as well as a cross-complaint that Puente filed against Pfau alleging harassment. Plaintiffs felt ostracized by their co-workers and like their superiors were marginalizing and minimizing their concerns about Puente's harassment, his threat against Pfau, and the MPD's response. During this time, Pfau had a training request denied and his name was removed, without explanation, from the schedule to work at Milwaukee's Juneteenth Day festival, which he had done for years.

In March 2013, plaintiffs filed charges with the U.S. Equal Employment Opportunity Commission (EEOC) and the Wisconsin Department of Workforce Development's Equal Rights Division (ERD) alleging sexual harassment by Puente and ongoing retaliation by the MPD.

In April 2013, Sergeant Justin Sebestyen, who had replaced Seitz as plaintiffs' supervisor, wrote a memo to the director of the Academy, Captain Victor Beecher, accusing Gabler of inappropriate "verbal outbursts" about her "workload," among other things. *See* Beecher Dep. Ex. 58, ECF No. 80-22. That September and the following January, Sebestyen filed performance reviews criticizing Gabler for "express[ing] her displeasure verbally" and recommending that she be "cognizant of her negative

3

verbalization when around her co-workers and speak with a supervisor if concerns arise." *See* Gabler Decl. Ex. E, ECF No. 78-15; Gabler Decl. Ex. G, ECF No. 78-17.

In December 2013, plaintiffs received notice of their right to sue from the EEOC. Soon thereafter, a sergeant from IAD told Pfau that Ted Puente's brother, then a Milwaukee alderman, had complained to the MPD about Pfau staring at him in a way that made him "uncomfortable" and "scared." *See* Pfau Dep., *supra*, at 163:14–164:4. The sergeant indicated that "someone of high rank" would talk to the alderman and "squash" his complaint. *Id.* at 164:19–165:12.

In January 2014, Pfau planned to attend a weeklong firearms trade show and training event in Las Vegas but had to cancel those plans when he was transferred from the Academy to MPD District 3. Pfau met with Captain Jason Smith in District 3 and told Smith that he would like to join "the bicycle unit." *Id.* at 190:8–:10. Within a few months, Pfau took an open bike position "in the Marquette Area." *See id.* at 192:1–:13. Gabler heard that she was supposed to be on the same transfer order as Pfau, but her Academy replacement got injured, so she was never transferred.

In March 2014, plaintiffs filed their complaint in this action, and local news outlets like the *Milwaukee Journal Sentinel* publicized their allegations. Soon thereafter, a supervisor called Pfau at home and told him that he was "back on the squad car" and "no longer on the bikes." *See* Pfau Dep., *supra*, at 195:12–197:13. Gabler was on maternity leave at the time.

In April 2014, Gabler returned from maternity leave needing a place to pump breastmilk twice a day. At first, she used a locked closet near the gym in the Academy building, which required that she go to the front office to get the key and then return the

4

key when she was done. *See* Gabler Dep., *supra*, at 91:12–:22. After about two weeks, Sebestyen told her to "stay out of the front office," to "stop walking around the building," and not to "leave the floor"—that is, the basement of the building, where the firearms range is located—which "posed a problem" because the closet where Gabler had been pumping was on a different floor, as was the locker room where Sebestyen and Lieutenant Clint Harrison had initially suggested that she pump. *See id.* at 93:25–94:14. Gabler spent three months sneaking out of the basement twice a day to pump.

In May 2014, Sebestyen told Gabler, for the first time, to pick and work consistent hours. For years, Gabler and her fellow instructors had maintained adjustable daily schedules based on the classes they were teaching, other professional responsibilities, and childcare needs, among other things. Gabler chose to work from 7:30 a.m. to 3:30 p.m. each day and has maintained those hours ever since, asking for permission from her boss whenever she needs to come in late or otherwise deviate from her schedule.

In July 2014, Sebestyen filed a performance review noting that Gabler "should remain focused on the tasks at hand during her workday and avoid excessive socializing during work hours." *See* Gabler Decl. Ex. F, ECF No. 78-16. The review recommends that Gabler "perform her work duties in her assigned area, as her workload is substantial." *Id.* Gabler says, "In early August 2014, my sergeant restricted me to my office without explanation." Gabler Decl., ECF No. 78, ¶ 13.

Between mid-2014 and mid-2015, the MPD temporarily transferred Pfau from District 3 back to the Academy twice. The first time, he spent several months as a firearms and TASER instructor. The second time, he spent a few days designing a new five-week TASER training program and teaching it for a day.

5

In May 2016, while Pfau was working in District 3, he was dispatched to the scene of a suspected homicide and told to canvass the neighborhood for potential witnesses. One of the people with whom Pfau spoke was subject to an outstanding arrest warrant from the Wauwatosa Police Department (WPD). After Pfau was "cleared" from the scene, he called the WPD to confirm the warrant and arrested the man in question. When Pfau returned to the station, Lieutenant Iris Ziolkowski, a District 3 supervisor, and Sergeant Rodney Washington, the "incident commander" (i.e., the supervisor of the crime scene), reprimanded him for arresting a potential witness at a crime scene in violation of MPD practice. Pfau was removed from the bicycle unit.

Pfau then spoke with "two of [his] block captains" and "the assistant for Alderman Michael Murphy" to let them know that, because he had been removed from the bicycle unit, he could "no longer help [them] with . . . citizen complaints." *See* Pfau Dep., *supra*, at 224:17–:25, 225:3–:9. Pfau then heard that "some of these people called up the captain, the mayor, and the chief of police," which "pissed off [his] captain," Shunta Boston-Smith, who "assigned [him] desk duty for two weeks as retaliation." *Id.* at 225:11–:15. Pfau has not been "put back on a bike" since then. *Id.* at 230:16–:18.

In July 2016, Pfau asked to be transferred from District 3 to a position in the "Executive Protection Unit," and in January 2017, he asked to be transferred to a position in "Court Administration." *See* Pfau Decl., ECF No. 80, ¶ 20. The MPD denied both of these transfer requests.

## II. DISCUSSION

Plaintiffs assert claims under Title VII's antiretaliation provision, which "prohibits an employer from 'discriminat[ing] against' an employee . . . because that individual

6

'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (alteration in original) (quoting 42 U.S.C. § 2000e–3(a)). To succeed on a Title VII retaliation claim, a plaintiff "must demonstrate that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection exists between the two." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009).

### A. Protected Activity

Protected activity under Title VII consists of opposition to discriminatory employment practices and participation in "official" Title VII proceedings and investigations, *see Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 746–47 (7th Cir. 2010). Defendant concedes that filing charges with the EEOC and the ERD and prosecuting a civil lawsuit under Title VII constitute protected participation in official Title VII proceedings. Thus, I need only consider whether plaintiffs engaged in protected opposition to unlawful employment practices prior to filing charges in March 2013.

To demonstrate protected opposition, a plaintiff need not prove that she "opposed an action that in fact violated Title VII. All that is required is that 'she reasonably believed in good faith that the practice she opposed violated Title VII.'" *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002) (citations omitted) (quoting *Alexander v. Gerhardt Enterprises, Inc.*, 40 F.3d 187, 195 (7th Cir. 1994)). A plaintiff's belief that she opposed an unlawful employment practice is "in good faith" if it is genuine and is "reasonable" if it is not "completely groundless," meaning that it does not "rest[]

7

on facts that no reasonable person possibly could have construed as a case of discrimination." *Id.* (quoting *McDonnell v. Cisneros*, 84 F.3d 256, 259 (7th Cir. 1996)).

Plaintiffs argue that the MPD retaliated against them after they "reported Ted Puente's death threat[]" in May 11, 2012, suggesting that reporting Puente's conduct that day was protected activity under Title VII. *See* Pls.' Opp'n Br., ECF No. 83, at 9–10. But Title VII only protects employees from retaliation for opposing practices made unlawful by Title VII, § 2000e–3(a), and workplace misconduct is not unlawful under Title VII unless it amounts to employer discrimination based on "race, color, religion, sex, or national origin," *id.* § 2000e–2(a). Nothing in the record suggests that Puente acted as he did on May 11, 2012, because of race, color, religion, sex, or national origin, so no reasonable jury could find that plaintiffs reasonably believed that they were opposing an unlawful employment practice when they reported Puente's death threat.

The record does suggest, however, that Gabler engaged in protected activity by opposing what she reasonably (and in good faith) believed to be sexual harassment by Puente in violation of Title VII. Based on Gabler's deposition testimony, a reasonable jury could find that (1) Puente persistently harassed Gabler, then the only female firearms instructor, in "sex-specific and derogatory terms" on a daily basis for years, *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); (2) she repeatedly complained to her supervisor about Puente's conduct toward her; and (3) her supervisor did not take reasonable steps to prevent the harassment from recurring. A reasonable person could construe this as discrimination, *see Kriescher v. Fox Hills Golf Resort & Conference Ctr.*, 384 F.3d 912, 915 (7th Cir. 2004), so a reasonable jury could find that Gabler's opposition to it was protected activity under Title VII.

8

Plaintiffs argue that Pfau similarly engaged in protected activity by opposing what he reasonably believed in good faith to be sexual harassment by Puente in violation of Title VII, but I disagree. The record suggests that Puente regularly harassed Pfau for being "gay." If Pfau were a gay man, a reasonable person could construe such harassment as sex-based discrimination. *See Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339, 341 (7th Cir. 2017). But nothing in the record suggests that Pfau is, in fact, gay or even that Puente thought that he was. At most, a reasonable person could construe Puente's conduct toward Pfau as laden with "offensive sexual connotations," *see Oncale*, 523 U.S. at 81, but not as discrimination "*because of* his sex," *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 562 (7th Cir. 2016). Thus, Pfau could not have reasonably believed that Puente's conduct toward him was unlawful under Title VII, and his opposition to that conduct, if any, was not protected activity.

In sum, a reasonable jury could find that Gabler (but not Pfau) engaged in protected opposition to sexual harassment in the workplace prior to May 11, 2012, and that both plaintiffs engaged in protected participation in official Title VII proceedings by filing discrimination and retaliation claims with the EEOC and the ERD on March 8, 2013, and by bringing this lawsuit on March 11, 2014, and prosecuting it since then.

### B. Materially Adverse Action

To demonstrate that they suffered materially adverse actions by their employer, plaintiffs must show that "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N.*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

9

This standard focuses on "*material* adversity" and "reactions of a *reasonable* employee" in order to "separate significant from trivial harms" and to "avoid[] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68–69. That said, "the materiality of the challenged action" must be assessed from "the perspective of a reasonable person in the *plaintiff's* position," as "the significance of any given act of retaliation will often depend upon the particular circumstances" in which it occurs. *Id.* at 69–70 (emphasis added).

Plaintiffs argue that they each suffered a dozen or more adverse actions by the MPD in retaliation for their protected activities. However, as defendant notes, plaintiffs have made little, if any, meaningful effort to show that the MPD's actions were *materially* adverse under the circumstances. Indeed, plaintiffs' near-total failure to cite to materials in the record sufficient to satisfy their burden of proof on this element all but dooms their Title VII retaliation claims. *See* Fed. R. Civ. P. 56(c)(1). Nevertheless, the present record suggests that a small number of the MPD's allegedly adverse actions may have been materially adverse and, thus, that a reasonable jury could find for plaintiffs on this issue. As such, I will generally discuss the adverse actions plaintiffs say they suffered.

First, plaintiffs point to numerous "petty slights or minor annoyances" that they consider to be adverse. *See id.* at 68. For example, they say that, soon after Puente's death threat, Beecher conducted a departmental-policy review session with the firearms instructors "in an inappropriate joking manner" that Gabler found offensive. Pls.' Opp'n Br., *supra*, at 9. Plaintiffs were similarly bothered by the demeanor of two officers from IAD who conducted a second departmental-policy review session in January 2013. *See id.* at 10. They also complain that their supervisors made light of their concerns, "which

made [them] look bad, like [they] were exaggerating." *See* Gabler Dep., *supra*, at 155:14–:17. Nothing in the record suggests that these and similar actions by the MPD caused plaintiffs any harm, much less significant, actionable harm. Thus, no reasonable jury could find that these actions by the MPD were materially adverse.

Next, plaintiffs cite, as adverse actions, Sebestyen (1) "accusing [Gabler] of poor behavior in the workplace" in his April 2013 memo to Beecher and (2) "giving her . . . bad review[s]" in 2013 and 2014. Pls.' Opp'n Br., *supra*, at 10. Yet, nothing in the record suggests that Sebestyen's memo about Gabler or his reviews of her performance "resulted in [any] actual consequences for her." *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1109 (7th Cir. 2012). Therefore, "[e]ven if these documents could be considered adverse, . . . they can[not] fairly be described as 'materially' adverse." *Id.*

Plaintiffs note that, during an interview as part of the IAD's investigation of the May 2012 incident with Puente, one of the investigators threatened to have Gabler transferred from the Academy and that, later, the MPD planned to transfer her, though she was never actually transferred. In this context, "unfulfilled threat[s]" are generally not considered to be materially adverse as they tend to cause no more harm than the "petty slights or minor annoyances" that "the Supreme Court has excluded from the bounds of materially adverse actions." *Poullard v. McDonald*, 829 F.3d 844, 857 (7th Cir. 2016) (quoting *Burlington N.*, 548 U.S. at 68). As nothing in the record suggests that Gabler suffered anything worse than trivial harm from the threat or plan to have her transferred, no reasonable jury could find that these actions were materially adverse.

Plaintiffs also argue that the MPD denied Pfau training opportunities in retaliation for his protected activities. Again, though, nothing in the record suggests that Pfau

11

suffered any actionable harm as a result of these actions. Rather, at most, the record reflects that Pfau wanted to attend a week-long FBI survival training course in 2012 and a week-long firearms trade show in 2014 and that the MPD declined his requests to be paid his normal wages to attend those events as if he were at work. No reasonable jury could find that the MPD's choice not to pay Pfau to attend these optional events was materially adverse under the circumstances.

Plaintiffs list Pfau's transfers between the Academy and District 3 and changes in his job responsibilities (e.g., removal from the bicycle unit) as adverse actions by the MPD. In general, "a transfer or reassignment of job responsibilities . . . is not materially adverse unless it represents a *significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects" or "new tasks" that are, in some meaningful sense, "dirtier, more arduous, less prestigious, or objectively inferior" to those the employee was previously assigned to perform. *Stephens*, 569 F.3d at 791. Subject to an exception that I discuss next, plaintiffs do not cite to anything in the record tending to show that any of Pfau's transfers or reassignments adversely affected his hours, compensation, or career prospects or resulted in a significant change in his duties such that his new duties were objectively inferior to his prior duties. Indeed, apart from his interest in the bicycle unit, I cannot discern from the present record whether he even had "an idiosyncratic preference" for any of his positions or assignments. *See Tart v. Illinois Power Co.*, 366 F.3d 461, 473 (7th Cir. 2004). Thus, for the most part, no reasonable jury could find that any of Pfau's transfers or reassignments—or for that matter, the MPD's denials of his transfer and reassignment requests—were materially adverse.

The exception to which I alluded above involves Pfau's removal from the bike unit in May 2016 following his arrest of a potential witness near a crime scene and his two-week reassignment to "desk duty" soon thereafter. The record suggests that the MPD officials responsible for these reassignments meant for them to be punitive and that Pfau interpreted them that way. Based on this, a jury could infer that a reasonable officer in Pfau's position would have found these reassignments to be materially adverse under the circumstances.

Finally, a reasonable jury could find that the workplace conditions to which Gabler was subjected after she returned from maternity leave were materially adverse. For example, based on her deposition testimony, a jury could find that Sebestyen deliberately and substantially interfered with Gabler's ability to express breastmilk at work, which any reasonable employee in her position would have found to be materially adverse. Indeed, viewing the record in the light most favorable to plaintiffs, Sebestyen's conduct may have been actionable sex discrimination in itself, *see, e.g.*, *E.E.O.C. v. Houston Funding II*, Ltd., 717 F.3d 425, 428 (5th Cir. 2013), though plaintiffs have not asserted such a claim here. Moreover, a jury could find that suddenly switching Gabler from an adjustable schedule to a fixed one was materially adverse in light of her circumstances as a new parent. *See Burlington N.*, 548 U.S. at 69.

### C. Causal Connection

That plaintiffs can show that they engaged in activity protected under Title VII and suffered materially adverse actions by the MPD is not enough to prevail on their Title VII retaliation claims. They must also prove that "a causal connection exists between the two," *Stephens*, 569 F.3d at 786, and they must do so "according to

13

traditional principles of but-for causation," *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). In other words, plaintiffs must demonstrate that each materially adverse action they suffered "would not have happened without the [protected] activity." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014).

Yet, "[n]o affirmative evidence suggests that the decision-makers" responsible for the MPD's adverse actions "were even *aware* of the plaintiffs' [protected activities] before they [acted], much less that they [acted] intending to retaliate against the plaintiffs" for those activities. *See Brown*, 700 F.3d at 1108. Plaintiffs argue that it was "common knowledge" within the MPD that they had filed this lawsuit because it was "covered in local news media" and, thus, that "the decision-makers must have known about [it]." *See id.* But the MPD's relevant decision-makers all attest that they didn't know about any of plaintiffs' protected activities before they acted. *See* Sebestyen Aff., ECF No. 71, ¶¶ 13–14; Ziolkowski Decl., ECF No. 63, ¶¶ 13–14; Washington Decl., ECF No. 64, ¶¶ 12–13; Boston-Smith Aff., ECF No. 66, ¶ 11. And, even if they did, to establish causation, "plaintiffs must produce evidence that a retaliatory motive *actually* influenced [each] decision-maker, not merely that it *could* have." *Brown*, 700 F.3d at 1108. As plaintiffs have not produced any such evidence, no reasonable jury could find that a causal connection exists between any protected activity by plaintiffs and any materially adverse action by the MPD. Accordingly, plaintiffs' Title VII retaliation claims fail, and I must grant summary judgment in defendant's favor.

### III. CONCLUSION

As a final matter, plaintiffs move to strike new arguments from defendant's reply brief in support of its summary-judgment motion, as well as documents defendant

submitted in support of those arguments. Because I did not rely on the challenged arguments or documents, and they did not influence any decision that I made in this case, plaintiffs' motion to strike them is unnecessary, and I will, therefore, deny it.

**THEREFORE, IT IS ORDERED** that defendant's motion for summary judgment (ECF No. 59) is **GRANTED**, and the Clerk of Court shall enter judgment accordingly.

**IT IS ALSO ORDERED** that plaintiffs' motion to strike (ECF No. 93) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 7th day of May, 2018.

s/Lynn Adelman
LYNN ADELMAN
District Judge